**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Lawrence REGISTER, Fred Hornsby and Daniel John Cochran, Defendants-Appellants.**

**No. 72–3248.**

United States Court of Appeals, Fifth Circuit.

June 27, 1974.

Rehearing Denied Sept. 4, 1974.

---

Wesley R. Asinof, Atlanta, Ga., for Fred Hornsby.

Edward T. M. Garland, Atlanta, Ga., for Daniel John Cochran.

Theodore S. Worozbyt, Edgar A. Neely, III, Atlanta, Ga., for Lawrence Register.

John W. Stokes, U. S. Atty., Robert L. Smith, Anthony M. Arnold, Asst. U. S. Attys., Atlanta, Ga., for plaintiff-appellee.

Before BROWN, Chief Judge, and RONEY and GEE, Circuit Judges.

GEE, Circuit Judge:

Since the Court is not unanimous in its disposition of this appeal, the opinion is constructed in subparts to indicate our action more clearly. In parts A–C we agree as to the disposition of particular points of error raised and as to the affirmance of the convictions under

Count Two. In parts D–E Chief Judge Brown and Judge Roney agree that the convictions under Counts Three and One must be affirmed. Judge Gee dissents from subparts D–E of the Court's opinion.[1]

Appellants, Lawrence Register, Fred Hornsby and Daniel John Cochran, were indicted along with others in a three-count indictment charging (1) conspiracy to acquire, transport, and conceal marijuana in violation of 26 U.S.C. §§ 4741–4744; (2) actual importation of marijuana in violation of 21 U.S.C. § 176a; and (3) transfer of marijuana in violation of 26 U.S.C. § 4742(a).[2] Although some of those named in the indictment pled guilty, all three appellants pled not guilty and went to trial before a jury in the United States District Court for the Northern District of Georgia. A mistrial was declared as to Register, and he was subsequently tried separately by another jury. His fate, however, was ultimately the same as that of Hornsby and Cochran. All three appellants were found guilty on all three counts and received the same sentences: five years' imprisonment on Count One, five years on Count Two to run consecutively with Count One, and five years on Count Three to run concurrently with Count One. Each appellant complains to us that his conviction culminated numerous errors by the trial judge. After careful review of the proceedings below, the Court affirms the convictions of all the appellants on all counts.

Register, Hornsby and Cochran, along with several others, organized and funded a scheme for flying a large amount of marijuana in from Jamaica. Unfortunately for them, Gilmore Sims, the pilot recruited for the job, informed the Bureau of Narcotics and Dangerous Drugs, enabling its agents to infiltrate the conspiracy thoroughly at an early stage. As testified to by undercover agents and co-conspirators who turned state's evidence, appellants provided funds and made arrangements for Sims to fly to Jamaica, pick up approximately 3,250 pounds of marijuana, and return. When the plane touched down in Georgia carrying contraband and undercover agents, Hornsby and Register loaded the marijuana into a van in which Hornsby then departed, followed closely by Register and more distantly by narcotic agents. When Hornsby pulled off the road to talk to Register about his fears of being under surveillance, they were amply confirmed The two were arrested, the marijuana was seized, and subsequently Cochran was apprehended.

Before discussing the three counts of the indictment, we considered and dispose of some less troublesome, more particular claims of error.

## A.

## COCHRAN

Several noteworthy evidentiary and procedural points are raised by appellant Cochran only. Each of his complaints concerning admission of evidence against him is especially important to him, since the contested bits of evidence comprise the greatest part of the government's case linking him to the conspiracy. Thus, were we to rule that any one of these critical items of evidence was improperly admitted, his contention of insufficiency of the evidence would have some validity. But as the case

---

1. For historical precedent for this appellate opinion procedure see Stanga v. McCormick Shipping Corp., 268 F.2d 544, 546, 551 (5th Cir. 1959); United States v. DeWitt, 265 F.2d 393, 394, 401 (5th Cir. 1959); Canal Insurance Co. v. Dougherty, 247 F.2d 508, 509, 513 (5th Cir. 1957). Cf. Grigsby v. Coastal Marine Service of Texas, Inc., 412 F.2d 1011, 1023 (5th Cir. 1969); Louisiana Power & Light Co. v. FPC, 483 F.2d 623, 624, 632 (5th Cir. 1973).

2. Both the old Marijuana Tax Act, 26 U.S.C. §§ 4741–4744, and the old Marijuana Import Statute, 21 U.S.C. § 176a, were repealed by the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 801 et seq., effective May 1, 1971, over six months after the last overt act alleged as part of this conspiracy.

against him went to the jury, it is sufficient to support his conviction.

### 1. *Telephone Conversation*

Undercover agent Richel testified that, after an initial aborted run to Jamaica, he was on an extension phone when the pilot Sims called Register, asked him why the marijuana was not delivered to the Jamaican airport as planned, and said that he needed more money if they wanted him to make another trip. Richel related that Register responded that furnishing additional money was not up to him but gave Sims the name and telephone number of "the money man"—Danny Cochran, at 404–252–8489. Richel further testified that he remained on the extension while Sims presumably dialed the number given, asked for Danny Cochran, and heard a male voice answer, "I am Danny." When Sims said that he had been referred by Register, the man identifying himself as Cochran said that he or his representative would meet Sims at the airport when the marijuana arrived and pay Sims ten thousand dollars and ten dollars a pound. No objection was made to the authentication of this voice as Cochran's, and none would have been sustainable.

■ On one hand, a telephone call out of the blue from one who identifies himself as X may not be, in itself, sufficient authentication of the call as in fact coming from X. On the other, courts regularly admit testimony of telephone conversations when the call is placed by the witness himself to a number listed to X and the person answering identifies himself as X. See McCormick on Evidence § 226 and cases cited therein. Our situation is much closer to the second example than to the first. All that is missing is the testimony of the one who mechanically dialed the number. There was, however, repeated evidence that telephone number 404–252–8489 was listed to Danny Cochran, we are most persuaded, as no doubt was the jury, by the fact that the one who identified himself as Danny proceeded to

converse fluently in the role of "money man" as indicated by Register, and as supported by unassailable testimony by a co-conspirator who had *himself* placed a call to Cochran at the same number and talked to him in his capacity as "money man." Such circumstantial evidence was more than sufficient authentication to make a *prima facie* case that would allow the issue of identity to be decided by the jury. See Learned Hand's analysis in Van Ripper v. United States, 13 F.2d 961, 968 (2d Cir. 1926).

### 2. *Flight*

Over Cochran's strenuous objection, Miss Kim Smith, a teenage girl who was babysitting in Cochran's apartment with his eight-month-old daughter on the evening following the afternoon of the drug seizure, was permitted to testify that her telephone conversation with Cochran that evening was interrupted by a police drug raid and that, when she returned to the phone to tell Cochran of the raid of his apartment, he hung up and she had never seen him since. She further testified that, early the next morning, she took the Cochran baby home with her, where she and her mother kept the child until that afternoon, when a man came to pick her up. Kim's mother confirmed her daughter's testimony.

■ We acknowledge the low probative value of such ambiguous evidence of flight. See Wong Sun v. United States, 371 U.S. 471, 483–484, 83 S.Ct. 407, 9 L. Ed.2d 441 (1963). There was no direct evidence that Cochran knew of the seizure of the contraband several hours earlier. This raid, moreover, was conducted by the Georgia Bureau of Investigation on another charge. Some consciousness of guilt, however, is indicated by Cochran's failure to come home. The problem is that any sense of guilt which prompted Cochran's actions might have been unrelated to the smuggling conspiracy here charged. We believe that, properly instructed, the jury was fully capable of appreciating that fact. As counsel also points out, a danger existed that the jurors might be prejudiced against

Cochran for leaving his eight-month-old daughter (although his wife talked with the babysitter the next day.) Any prejudice, however, flows from the same human emotion which makes it so unlikely that Cochran would fail to come home absent the relevant consciousness of guilt.

We still adhere to the statement in Alberty v. United States, 162 U.S. 499, 510, 16 S.Ct. 864, 40 L.Ed. 1051 (1896), which we quoted with approval in Vick v. United States, 216 F.2d 228, 232 (5th Cir. 1954):

> While, undoubtedly, the flight of the accused is a circumstance proper to be laid before the jury, as having a tendency to prove his guilt, at the same time, as was observed in Ryan v. People, 79 N.Y. 593, "there are so many reasons for such conduct consistent with innocence that it scarcely comes up to the standard of evidence tending to establish guilt, but this and similar evidence has been allowed upon the theory that the jury will give it such weight as it deserves, depending upon the surrounding circumstances."

This same deference to the jury was reflected in the Ninth Circuit's holding in Shorter v. United States, 412 F.2d 428, 430 (9th Cir. 1969), that it was not necessary for the government to show that the defendant *knew* he was being sought for the particular offense charged.

The jury instruction did not overemphasize the relevance of Cochran's abrupt departure. To the contrary, it placed the evidence in its proper perspective. The jury was cautioned:

> . . . In your consideration of the evidence of flight or concealment, you should consider that there may be reasons for this which are fully consistent with innocence—such as the fear of apprehension, unwillingness to confront the police, or other matters. And a feeling of guilt may not necessarily reflect actual guilt; but, as I say, evidence of intentional flight or concealment is a fact which, if proved, may be considered by you the jury in the light of all the other evidence of

the case in determining guilt or innocence of the accused.

For what it was worth, the evidence of flight was properly placed before the jury.

### 3. *Statements by Co-conspirators*

Cochran complains on appeal of the trial court's allowing testimony concerning two statements made by his co-conspirators which implicated him in the smuggling scheme. Richard Dimarzo, who was arrested with defendants Register and Hornsby, testified over objection that the day following their arrest Register's wife visited them in jail and Register asked her if Cochran had been arrested. Also over objection, undercover agent William Terry Fernandez was permitted to testify that on October 21, eleven days after the drug seizure and the arrests of Register and Hornsby, he visited Jerome McNally, subsequently arrested for his organizational role in the conspiracy, at his office, at which time McNally asked him about his contacts in Jamaica and told him that he was certain Cochran and Register would attempt to bring out more marijuana.

It is well established that an out-of-court statement of one conspirator is admissible against his fellow conspirator if made (1) during the course of the conspiracy and (2) in furtherance of any of its objects. Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1959). But it is equally well settled that in federal conspiracy trials a statement made during a subsequent period when the conspirators were engaged in nothing more than concealment of the crime cannot come in under this exception to the hearsay rule. Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970). Also, in federal court the requirement that the statement be "in furtherance of" the conspiracy is applied to exclude post-arrest confessions and admissions which could certainly be of no aid to any continuing enterprise. United States v. Hernandez, 441 F.2d 157 (5th Cir. 1971), United States v. Harrell, 436 F.2d

606 (5th Cir. 1970). However, if co-conspirators still at large are fully capable of perpetuating an on-going conspiracy, it is entirely possible that they or their arrested brethren may make statements intended to further effectuate the conspiracy. United States v. Sarno, 456 F.2d 875 (1st Cir. 1972).

■ Here, there was evidence that the overall conspiracy was still active after Register and Hornsby were arrested. Dimarzo testified that within eight days of the arrests, while he was still confined in a cell with Register and Hornsby, they wrote a letter and asked him to look it over. The letter requested one Gene Wheeler to get up one thousand dollars and take it to a man named Jim Stephens at the airport who would know how to take care of bringing in more marijuana. Dimarzo also stated that Wheeler later came to the jail window and told them that he did not have one thousand dollars and that, because of their arrests, Stephens was leery of doing anything more. Dimarzo further testified that, after Hornsby got out on bond some thirty-four days after their arrests, Register told him that Hornsby would have marijuana to sell to raise money for their bonds.

The preceding evidence indicates that an on-going conspiracy continued at least up to, and including, the alleged statement by McNally to Fernandez that Register and Cochran would be importing more marijuana. There is little doubt that this statement was intended to be in furtherance of the general conspiratorial scheme. The earlier question by Register to his wife concerning Cochran is somewhat more problematical. It can, however, be inferred that Register was interested in Cochran's being free to generate bond money from the criminal enterprise.

Our recent decision in Park v. Huff, 493 F.2d 923 (1974), affords Cochran no relief from damage done his defense by either hearsay statement.

■ After Register's severance from the first trial, he took the stand when called by Hornsby, who at that time had not yet pleaded guilty. No defense counsel questioned him on any inquiry he might have made of his wife concerning Cochran. Indeed, Cochran's counsel declined to examine Register at all, stating to the court that he was afraid of "opening the door" for the state to explore Cochran's involvement. But Register proved more than capable of keeping his own door closed to the state. Once he got the feel for it, he invoked the Fifth Amendment to every question asked him by the prosecution—including questions on his mere acquaintance with Cochran. After his resolve was established and the problems involved for everyone concerned were discussed, all parties excused Register from further testimony. Thus Register amply demonstrated that he was "unavailable" for the prosecution to question on the accuracy of the statement attributed to him by Dimarzo. If a denial of Cochran's involvement could have been elicited from him by anyone, the record reflects that Cochran's attorney stood a much better chance than did the prosecution. Under these circumstances, the state did not deny Cochran's right to confrontation of Register. Indeed, only the state offered any witness an opportunity to contradict Dimarzo's hearsay testimony. When Hornsby, who was supposedly present during Register's conversation with his wife, before pleading guilty took the stand in his own defense, he testified under cross-examination by the prosecution that he did not hear any such inquiry made concerning Cochran. Cochran was apparently content not to attempt further impeachment of the hearsay. In this posture it stands properly admitted.

■ The same conclusion is more readily apparent in the case of the second challenged item of hearsay. McNally, the alleged declarant, was called, following his guilty plea, by the government as a rebuttal witness. On direct examination he said that as far as he knew Cochran did not know anything about the agreement to import marijua-

na. On cross by Cochran's attorney, he expressly denied that he told agent Fernandez that Cochran would be interested in bringing in more of the drug. Thus as to Fernandez's hearsay testimony, Cochran fully exercised his right to confront the declarant and has no cause to complain.

### 4. *Insubstantial Procedural Points*

Counsel for Cochran belabored several issues during the course of trial which we find deserving of little comment on appeal.

■ First, Cochran's attorney persistently endeavored to cross-examine undercover agent Richel on "proper investigation techniques," ostensibly to show that his failure to employ such techniques in investigating Cochran's involvement cast some doubt on his guilt. The trial judge correctly ruled that the quality of the undercover investigation was irrelevant. The jury's evaluation of the accuracy of the evidence produced by that investigation should be the measure of its quality. We note that the principal evidence against Cochran supplied by a government agent was Richel's testimony about one telephone conversation overheard. Cochran's attorney was permitted to ask him if he made a tape recording of that conversation and to argue, with whatever persuasiveness he could muster, that the failure to do so destroyed the reliability of his testimony.

■ Second, Cochran complains that he should have been granted a mistrial after Dimarzo mentioned on the stand that Cochran had "stole" papers belonging to government agent Buslemier. Earlier in the trial, when Cochran's attorney attempted to cross-examine Buslemier on a letter which he wrote to the judge in Dimarzo's behalf, supposedly in return for his testimony, it was discovered that this letter was contained in a file belonging to agent Buslemier which Cochran had inexplicably picked up and showed to his attorney. This was the incident alluded to by Dimarzo under cross-examination by counsel for co-defendant Hornsby. We note that no objection was made to this line of questioning until Hornsby's counsel had emphasized the improper statement—whereupon Cochran's attorney asked that the jury be excused and made his motion for mistrial. When the jury returned, the trial judge instructed them to disregard completely any reference to the letter or to Cochran's connection with it. Such a statement, elicited by counsel for a co-defendant further exploiting the fruits of Cochran's improper action, is not in the same category with statements concerning other crimes or prior misconduct volunteered by prosecution witnesses. See United States v. Ratner, 464 F.2d 169 (5th Cir. 1972); Odom v. United States, 377 F.2d 853 (5th Cir. 1967). Any prejudice which resulted we hold cured by the court's timely instruction.

■ Third, Cochran contends that the trial judge abused his discretion in refusing to grant his motion for severance from joint trial with Hornsby. He relies upon De Luna v. United States, 308 F.2d 140 (5th Cir. 1962), in which one defendant tried to place all of the blame on his silent co-defendant. This was anything but the case here. Indeed, Hornsby denied even knowing Cochran and testified that Cochran was in no way involved in the conspiracy. Cochran did not contend that the smuggling venture did not exist, only that he did not participate. He was helped, not hindered, in this defense by Hornsby.

■ Finally, Cochran, joined by Hornsby, complains that the trial court erred in refusing their requests for certain material to which they felt they were entitled under the Jencks Act, 18 U.S.C. § 3500(e)(2), and the rule of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). First sought was any record made by agent Richel of his conversation with government witness Maierhoffer following the latter's arrest. Both Richel and Maierhoffer testified, and the trial court's inspection of Richel's file confirmed, that no substantially verbatim record

was made of Maierhoffer's oral confession; therefore, the Jencks Act was not applicable. See Palermo v. United States, 360 U.S. 343, 79 S.Ct. 1217, 3 L. Ed.2d 1287 (1959); United States v. Roberts, 455 F.2d 930 (5th Cir. 1972). Defendants also claimed that Richel's file contained *Brady* material in the form of prior inconsistent statements by Maierhoffer and information that he was involved in other criminal activities. However, the testimony was that no statement, inconsistent or otherwise, was recorded. And Maierhoffer's insistence that he had made no deal in exchange for his testimony made irrelevant any activities for which he had not been prosecuted. Also sought by the defendants was a report prepared by government agent Walker covering a conference he had with the pilot Sims when he first reported the smuggling scheme. An *in camera* examination by the trial judge confirmed the government's statement that Walker's report contained no exculpatory *Brady* material. We will not go beyond the trial court's finding to encourage shipping prosecutor's files to the appellate court whenever the defense cries *Brady*. Since Sims did not testify at trial, the Jencks Act is inapplicable.

Appellants' feeble complaint that the contraband should have been suppressed merits no comment in light of the vehicular search doctrine established in Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), and reiterated in Chambers v. Maroney, 399 U. S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

### B.

### ENTRAPMENT

All three appellants complain that the trial court mishandled the question of entrapment. But, because Register was tried separately after severance and because each advanced a different defensive theory, different problems are presented by each appeal.

█ Hornsby asserts that the trial court erred in two ways: (1) in following its jury charge on the classic "inducement" type of entrapment with a statement that Dimarzo, whom Hornsby asserted induced him, was not a law enforcement agent for whose actions the government was responsible; and (2) in refusing to find entrapment as a matter of law when there was overwhelming government participation in the crime. On the first point, it is indisputable that, as charged by the court, Dimarzo was not a government undercover agent; he was clearly a conspirator who, subsequent to his arrest, decided to plead guilty and testify against his co-conspirators. Hornsby argues that an issue of entrapment is raised by evidence that a private citizen, who was himself induced by government agents, in turn induced the accused to commit a crime. We need not reach this argument, because there was absolutely no evidence that Dimarzo was entrapped by the government into participating in the criminal enterprise. Hornsby's second point, and the cases on which he relies for support, have been emasculated by the Supreme Court's decision in United States v. Russell, 411 U.S. 423, 93 S.Ct. 1637, 36 L. Ed.2d 366 (1973). There is no denying that the government so thoroughly infiltrated this conspiracy that, when the plane touched down in Georgia with its cargo of marijuana, only one of the four persons on board was not a government agent, and *he* later turned state's evidence. But this in no way indicates a lack of predisposition on the part of appellants. And we do not find the undercover tactics ". . . so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction. . . ." 411 U.S. at 431, 93 S.Ct. at 1643, 36 L.Ed.2d at 373.

█ When the "police misconduct" argument crumbles with the weight of *Russell*, Cochran is left with no entrapment defense whatsoever. There was never any evidence that Cochran was in-

duced. Indeed, he unqualifiedly announced throughout the trial that he was not claiming he was entrapped. His tactic was to attack the prosecution's attempts to prove that he had anything whatever to do with this conspiracy. Taking this position, he was not entitled to a jury instruction on entrapment. United States v. Newcomb, 488 F.2d 190 (5th Cir. 1974).

▪ In addition to making the same argument as his cohorts concerning the extent of government participation, Register complains that, at his separate trial, the judge followed his instruction on entrapment with a comment that the jury should consider Register's statement that he went into the plan with his eyes open, knowing that it was wrong. Followed as it was by an instruction to the jurors that they might entirely disregard his opinion, the comment was permissible. We note that immediately before Register stepped from the stand he did testify: "I saw an easy way to make money. I did it because I wanted to. I agreed." The jury could hardly disregard such a candid admission.

### C.

### COUNT TWO

Count Two of the indictment on which all three appellants were found guilty charges:

> That, on or about October 10, 1970 in the Northern District of Georgia, Gerald McNally a/k/a Gerry, Richard F. Dimarzo a/k/a Dick Roberts, Lawrence Register a/k/a Larry Regenstein, James Burnett, Jimmy Ginn, Fred Hornsby and Daniel John Cochran a/k/a Danny, defendants herein, aided and abetted by each other and by persons to the Grand Jury unknown, knowingly, and with intent to defraud the United States, did import and bring into the United States approximately 3,250 pounds of marijuana, in violation of Section 176(a), Title 21, United States Code.

Section 176a of Title 21, United States Code, since repealed, provided in relevant part:

> Notwithstanding any other provision of law, whoever, knowingly, with intent to defraud the United States, imports or brings into the United States marijuana contrary to law, or smuggles or clandestinely introduces into the United States marijuana which should have been invoiced, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such marijuana after being imported or brought in, knowing the same to have been imported or brought into the United States contrary to law, or whoever conspires to do any of the foregoing acts, shall be imprisoned not less than five or more than twenty years and, in addition, may be fined not more than $20,000.

. . .

The jury at each trial essentially was instructed in the language of the indictment, followed by a recitation of the relevant part of § 176a.

▪ Cochran twice asked the trial court to dismiss Count Two, based on his contention that the law mentioned in the "contrary to law" provision of § 176a was § 4744 of the Marijuana Tax Act which *Leary* held violated a defendant's Fifth Amendment rights. This is the same argument presented by all three appellants on appeal. No other attack was made on Count Two, and no objection was made to how it was presented to the jury. Any other defect concerning this count would, therefore, have to rise to the magnitude of plain error before it would require reversal.

▪ As the charge was given to the jurors, there was no possibility that they would interpret Count Two to refer to the invalid § 4744. In compliance with *Leary*, the trial judge made absolutely no mention of § 4744 in his instructions. In explaining Count One, he summarized the still valid §§ 4741–4743. He did not expand the "contrary to law" phrase of § 176a in discussing Count Two. If anything presents a problem it is this failure to explain *what law*. But it is inconceivable that a jury would have construed § 176a to refer to the transferee tax section never mentioned.

By looking as instructed to § 176a a jury could have found each of the appellants guilty on Count Two under either of two theories: (1) that they imported or brought into the United States marijuana contrary to law, or (2) that they smuggled or clandestinely introduced into the United States marijuana which should have been invoiced.

We have previously recognized that "smuggling" or "clandestinely introducing" constitutes a different offense from "importing contrary to law." In construing 18 U.S.C. § 545,[3] the general smuggling statute which is identical in relevant part to § 176a, the Fifth Circuit held in Babb v. United States, 218 F.2d 538, 539–540 (5th Cir. 1955):

> The statute [§ 545] under which this prosecution is lodged defines two separate types of offenses: (A) smuggling or clandestinely introducing any merchandise which should have been invoiced, or use of false or forged documents, etc.; and (B) knowingly importing or bringing in any merchandise contrary to law, or receiving, concealing, etc. such merchandise knowing it to have been brought in contrary to law. These are distinct offenses, as shown by their legislative history. There is a vast difference between smuggling, clandestinely introducing, using false or forged documents, etc., on the one hand, and importing, bringing in or receiving, etc., merchandise, since the first manifestly is unlawful and evil per se, while importing, bringing in, receiving, etc., after importation, is not. [footnotes omitted]

The decision in *Babb* went on to explain that, while smuggling did not depend upon any other law for its illegality, importing contrary to law required allegations of facts which showed violation of other specific statutory requirements. Even earlier, in a related context, in Tomplain v. United States, 42 F.2d 205 (5th Cir. 1930), this Circuit cited United States v. Ritterman, 273 U.S. 261, 47 S.Ct. 371, 71 L.Ed. 636 (1926), for the proposition that the offense of smuggling is complete when an article is ". . . carried across the boundary in such a way as to avoid a port of entry. . . ." 42 F.2d at 205. In Thomas v. United States, 314 F.2d 936 (5th Cir. 1963), we held that, since smuggling was unlawful *per se* (citing *Babb*), no additional element of the § 176a offense of smuggling marijuana existed by virtue of the phrase "which should have been invoiced," which in this context meant no more than "lawfully entered and declared."

Here, the evidence of smuggling or clandestine introduction into this country is overwhelming. Viewing the evidence most favorably to the government, indeed viewing the evidence from any angle, it is clear that the three appellants, in their various capacities, organized and funded as principals the scheme whereby marijuana (not originating in the United States) was flown in from Jamaica surreptitiously in such a way as to avoid customs. It is very unlikely that the jury did not reach this virtually unavoidable conclusion.

 The other theory, that of importing contrary to law, also ensnares

---

3. 18 U.S.C. § 545 reads in part as follows: Whoever knowingly and willfully, with intent to defraud the United States, smuggles, or clandestinely introduces into the United States any merchandise which should have been invoiced, or makes out or passes, or attempts to pass, through the customhouse any false, forged, or fraudulent invoice, or other document or paper; or

Whoever fraudulently or knowingly imports or brings into the United States, any merchandise contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law—

Shall be fined not more than $10,000 or imprisoned not more than five years, or both.

the appellants. At both trials, there was uncontradicted testimony by a customs agent that neither appellants nor their agents aboard the plane stopped and declared the marijuana at customs as required by law. In the face of this testimony and the undisputed evidence of how this marijuana was flown in, it was not plain error to fail to charge the jury on the requirement that all merchandise flown in from another country pass through customs.[4] In Olar v. United States, 391 F.2d 773 (9th Cir. 1968), the Ninth Circuit held that it was not reversible error to fail to instruct the jury on the requirement that all merchandise brought in be unladen for inspection at customs when neither party had argued or even suggested that the merchandise had been unladen for inspection and the failure to do so was undisputable. Here, as in *Olar,* the failure to pass through customs properly is undisputed and indisputable. If, by some logic that escapes us, defendants had felt that the failure to instruct on customs laws hurt their case, they should have called it to the attention of the trial judge as required by Rule 30, Federal Rules of Criminal Procedure. Since they did not do so, we are hardly disposed·to find plain error.

### D.*

### COUNT THREE

Count Three of the indictment on which each defendant was convicted charges:

That, on or about October 10, 1970 in the Northern District of Georgia, Gerald McNally a/k/a Gerry, Richard F. Dimarzo a/k/a Dick Roberts, Lawrence Register a/k/a Larry Re-genstein, James Burnett, Jimmy Ginn, Fred Hornsby and Daniel John Cochran a/k/a Danny, defendants herein, aided and abetted by each other and by persons to the Grand Jury unknown, did transfer, not in pursuance of a written order form issued in blank for that purpose by the Secretary of the Treasury or his delegate, approximately 3,250 pounds of marijuana, in violation of Section 4742(a), Title 26, United States Code.

 Only Register specifically attacks conviction on Count Three. He argues that the only evidence demonstrating violation of the Marijuana Tax Act was testimony of a government agent elicited on re-direct examination that went beyond the scope of the cross-examination, and that Count Three was duplicative of Count One. The difficulty with his first contention is that trial counsel not only failed to object to the line of questioning on re-direct, but proceeded to interrogate the agent on re-cross-examination. Having made that tactical decision at trial, Register will not now be heard to allege it as plain error. As to the second contention, a count charging conspiracy may be joined with a count alleging substantive offenses that were the object of the conspiracy. Gordon v. United States, 438 F.2d 858, 878 (5th Cir. 1971), cert. denied, 404 U.S. 828, 92 S.Ct. 63, 30 L.Ed.2d 56 (1971); James v. United States, 416 F. 2d 467 (5th Cir. 1969), cert. denied, 397 U.S. 907, 90 S.Ct. 902, 25 L.Ed.2d 87 (1970). The essential elements of a conspiracy count are an agreement between persons to combine for an illegal purpose and an overt act by one of them in furtherance thereof. United States v. Falcone, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed.

---

4. Pursuant to authority granted him by 49 U.S.C. § 1509(c), the Secretary of Treasury has by regulation generally applied to civil aircraft the principal features of customs laws relating to entry of "vessels," particularly 19 U.S.C. §§ 1434, 1447, 1448, 1453, 1484 and 1485.
Specifically: 19 C.F.R. § 6.2(a) requires special permission not to land at an international airport; § 6.2(c) requires that im-ported merchandise not be unloaded without permission from customs officials; § 6.3 requires aircraft arriving with cargo from outside the United States to be entered through customs; § 6.7 requires a declaration at customs of such imported cargo.

* Parts D and E of the Court's opinion were authored by Judge Roney.

128 (1940); United States v. Lowry, 456 F.2d 341 (5th Cir. 1972). An aiding and abetting count, on the other hand, requires proof that someone actually committed the substantive offense (in this case, transfer of marijuana without a written order form) and that the defendant assisted in the commission. United States v. Barfield, 447 F.2d 85 (5th Cir. 1971); Hendrix v. United States, 327 F.2d 971 (5th Cir. 1964).

It is on the existence of a transfer that Judge Gee parts company with the majority. He would reverse the convictions on this count as plain error because he finds no evidence of a transfer in the record of either trial. He would also hold as a matter of law that, as transferees within the conspiracy, defendants could not have aided and abetted any transfer to themselves.

■ Under the statutory definition of transfer, "any type of disposition resulting in a change of possession" with one immaterial exception was taxable. 26 U.S.C. § 4761(4) (1964), 68A Stat. 566. The fact that Congress saw fit to exclude as a taxable event transfer to a common carrier is at least suggestive that all other changes in possession were within the congressional intent. In this case, those who had flown the marijuana in from Jamaica delivered it to two of the defendants at the airport. In Good v. United States, 410 F.2d 1217, rehearing denied, 415 F.2d 771 (5th Cir. 1969), cert. denied, 397 U.S. 1002, 90 S. Ct. 1131, 25 L.Ed.2d 413 (1970), involving an analogous provision of the Harrison Narcotics Act, 26 U.S.C. § 4704(a) (1964), 68A Stat. 550, we held that a transfer took place when the smugglers physically delivered narcotics to an agent of the defendant who had aided and abetted the unlawful importation. As in the present case, the defendants in Good did not participate in the actual importation, but merely aided and abetted it. As in the present case, there was a physical transfer to them from the smugglers. That Good dealt with a prosecution under a transferee provision while we deal with a transferor provision does not reduce its authority that a transfer may take place between conspirators. We cannot find as a matter of law that there was no transfer in this case.

■ Although the Fifth Amendment privilege against self-incrimination bars conviction of transferees for failure to pay the transfer tax, Leary v. United States, 395 U.S. 6, 89 S.Ct. 1532, 23 L. Ed.2d 57 (1969), the broad proposition that a transferee may never aid and abet a transferor does not follow. Lambert v. United States, 101 F.2d 960 (5th Cir. 1939), upon which Judge Gee relies, involved a conviction for conspiracy to sell morphine. The evidence, however, showed that the defendant had assisted only the buyer, not the seller. The *Lambert* court stressed the possibility of a conviction for either conspiracy to sell or aiding and abetting a sale on other facts. While a mere purchaser without more might not aid and abet the seller, the defendants here had major roles organizing the scheme resulting in the importation and transfer of the marijuana at the airport. All the evidence introduced to support the conspiracy charge shows that the defendants were more than mere transferees. This becomes a factual question that the jury, not the judges, should decide.

### E.

### COUNT ONE

Count One of the indictment charges:

That, beginning on or about September, 1970 and continuing to on or about October 21, 1970 in the Northern District of Georgia and elsewhere, in violation of Section 7237, Title 26, U.S.C., Gerald McNally a/k/a Gerry, Richard F. Dimarzo a/k/a Dick Roberts, Lawrence Register, a/k/a Larry Regenstein, James Burnett, Jimmy Ginn, Fred Hornsby and Daniel John Cochran a/k/a Danny, defendants herein, did unlawfully, willfully and knowingly combine, conspire, confederate and agree together and with each other and with Henry F. Maier-

hoffer and James Mobley, not named as defendants herein but named as co-conspirators and with various other persons whose names are to the Grand Jury unknown, to commit offenses against the laws of the United States, that is, to obtain, acquire, transport, conceal and facilitate the transportation and concealment of marijuana, in violation of Sections 4741 through 4744, Title 26, United States Code.

■ All three defendants challenge their Count One conspiracy convictions on the basis of the Fifth Amendment's privilege against self-incrimination. Leary v. United States, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969). The government responded to *Leary* at trial by dropping violation of section 4744 from the count. The district judge charged the jury accordingly. No more was required. *Leary* only prohibited prosecution under section 4744 of trans-fer*ees* for failure to pay the marijuana tax. In our view, Minor v. United States, 396 U.S. 87, 90 S.Ct. 284, 24 L.Ed.2d 283 (1969), holding that conviction under section 4742(a) of transferors for transferring marijuana to persons without official order forms did not offend the Fifth Amendment privilege, sustains the defendants' convictions.

■ Judge Gee would reverse the convictions as plain error on the ground that the count does not charge defendants with a crime of which they could be constitutionally convicted. As he sees it, Count One is worded in transferee terms and fails to allege a conspiracy to transfer marijuana. We read the indictment differently. Since a transfer could have taken place in violation of section 4742(a), the indictment charging a conspiracy to "obtain, acquire, transport, conceal and facilitate the transportation and concealment of marijuana, in violation of Sections 4741 through 4744" sufficiently apprises the defendants of the charge against them. This is especially so in view of Judge Gee's suggestion that of the sections cited in the indictment, only section 4742(a) charges a

crime. A reading of the statutes alleged together with the facts charged in the indictment is sufficient to enable defendants to prepare a defense and to avoid the hazard of double jeopardy, United States v. Cruikshank, 92 U.S. 542, 558, 23 L.Ed. 588 (1875); James v. United States, 416 F.2d 467, 472 (5th Cir. 1969), cert. denied, 397 U.S. 907, 90 S.Ct. 902, 25 L.Ed.2d 87 (1970), especially in view of Rule 7(f), F.R.Crim.P., providing for a bill of particulars. The indictment, therefore, complies with Rule 7(c), F.R.Crim.P.

Since we find no error in the record, much less plain error, the convictions on all counts are

Affirmed.

GEE, Circuit Judge (dissenting):

As noted at the outset, I find myself in disagreement with the Court's disposition of the Count One and Count Three convictions.

### COUNT THREE

Count Three of the indictment on which each defendant was convicted charges:

> That, on or about October 10, 1970 in the Northern District of Georgia, Gerald McNally a/k/a Gerry, Richard F. Dimarzo a/k/a Dick Roberts, Lawrence Register a/k/a Larry Regenstein, James Burnett, Jimmy Ginn, Fred Hornsby and Daniel John Cochran a/k/a Danny, defendants herein, aided and abetted by each other and by persons to the Grand Jury unknown, did transfer, not in pursuance of a written order form issued in blank for that purpose by the Secretary of the Treasury or his delegate, approximately 3,250 pounds of marijuana, in violation of Section 4742(a), Title 26, United States Code.

The language used in Count Three reflects the peculiar nature of the old Marijuana Tax Act. As discussed in Leary v. United States, 395 U.S. 6, 14–15, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969), the transfer tax provisions, 26 U.S.C. §§

4741–4744,[1] envisioned a fanciful world in which marijuana could legally be bought and sold: upon paying a tax to the IRS and furnishing the government with the name and address of the proposed vendor, the purchaser would obtain a written order form; the original of this form had to be given by the purchaser to any person who transferred marijuana to him. Two crimes were created: § 4744 made it unlawful for a transferee required to pay the tax either to acquire marijuana without having paid the tax or to transport, conceal, or facilitate the transportation or concealment of, any marijuana so acquired; with certain exceptions irrelevant here, § 4742 made it unlawful for any person

---

[1]. Insofar as here relevant, 26 U.S.C. §§ 4741–4744 provide:

§ *4741. Imposition of tax*

(a) Rate.—There shall be imposed upon all transfers of marihauna which are required by section 4742 to be carried out in pursuance of written order forms taxes at the following rates:

(1) Transfers to special taxpayers.— Upon each transfer to any person who has paid the special tax and registered under sections 4751 to 4753, inclusive, $1 per ounce of marihuana or fraction thereof.

(2) Transfers to others.—Upon each transfer to any person who has not paid the special tax and registered under sections 4751 to 4753, inclusive, $100 per ounce of marihuana or fraction thereof.

(b) By whom paid.—Such tax shall be paid by the transferee at the time of securing each order form and shall be in addition to the price of such form. Such transferee shall be liable for the tax imposed by this section but in the event that the transfer is made in violation of section 4742 without an order form and without payment of the transfer tax imposed by this section, the transferor shall also be liable for such tax.

§ *4742. Order forms*

(a) General requirement.—It shall be unlawful for any person, whether or not required to pay a special tax and register under sections 4751 to 4753, inclusive, to transfer marihuana, except in pursuance of a written order of the person to whom such marihuana is transferred, on a form to be issued in blank for that purpose by the Secretary or his delegate.

(c) Supply.—The Secretary or his delegate shall cause suitable forms to be prepared for the purposes mentioned in this section and shall cause them to be distributed to each internal revenue district for sale. The price at which such forms shall be sold shall be fixed by the Secretary or his delegate, but shall not exceed 2 cents each. Whenever any of such forms are sold, the Secretary or his delegate shall cause the date of sale, the name and address of the proposed vendor, the name and address of the purchaser, and the amount of marihuana ordered to be plainly written or stamped thereon before delivering the same.

(d) Preservation.—Each such order form sold by the Secretary or his delegate shall be prepared to include an original and two copies, any one of which shall be admissible in evidence as an original. The original and one copy shall be given to the purchaser thereof. The original shall in turn be given by the purchaser thereof to any person who shall, in pursuance thereof, transfer marihuana to him and shall be preserved by such person for a period of 2 years so as to be readily accessible for inspection by an officer or employee mentioned in section 4773. The copy given to the purchaser shall be retained by the purchaser and preserved for a period of 2 years so as to be readily accessible to inspection by any officer or employee mentioned in section 4773. The second copy shall be preserved in the records of the internal revenue district.

\* \* \* \* \*

§ *4743. Affixing of stamps*

The stamps provided in section 4771(a)(1) for marihuana shall be affixed by the Secretary or his delegate to the original order form.

§ *4744. Unlawful possession*

(a) Persons in general.—It shall be unlawful for any person who is a transferee required to pay the transfer tax imposed by section 4741(a)—

(1) to acquire or otherwise obtain any marihuana without having paid such tax, or

(2) to transport or conceal, or in any manner facilitate the transporation or concealment of, any marihuana so acquired or obtained.

Proof that any person shall have had in his possession any marihuana and shall have failed, after reasonable notice and demand by the Secretary or his delegate, to produce the order form required by section 4742 to be retained by him shall be presumptive evidence of guilt under this subsection and of liability for the tax imposed by section 4741(a).

\* \* \* \* \*

to transfer marijuana except pursuant to a written order form furnished by the transferee.

*Leary, supra,* held that the Fifth Amendment prohibits conviction under § 4744 for a transferee's failure to incriminate himself by paying the tax. Minor v. United States, 396 U.S. 87, 90 S.Ct. 284, 24 L.Ed.2d 283 (1969), held, however, that conviction of a *seller* under § 4742(a) for transferring marijuana not pursuant to a written order form was *not* invalid in the face of a Fifth Amendment claim. Therefore, until its repeal, § 4742(a) was a constitutionally permissible vehicle for prosecuting transfer*ors.*

Clearly no form was presented to any of these three appellants or their agents. Thus they might properly have been convicted for any transfer of marijuana in which they participated. The prosecution's problem was to find a "transfer."

26 U.S.C. § 4761(4) provides: "The term 'transfer' or 'transferred' means any type of disposition resulting in a change of possession, but shall not include a transfer to a common carrier for the purpose of transporting marijuana." Despite this broad definition, I have found no case in which § 4742(a) has been applied to one not a vendor, or at least a donor. The section has been applied in line with the statutory scheme envisioning a purchaser who pays the tax and obtains the forms which he then presents to his prospective vendor. Indeed, § 4742(c) speaks of the proposed vendor whose name and address are to be entered on the form.

Also, in my view these transfer tax provisions cannot properly be construed to make transferees "aiders and abettors" of the transferors who transfer marijuana to them not pursuant to the required form. To do so seems to me to violate the Supreme Court's holding in *Leary.* Two distinct crimes are created by the Tax Act: one for transferees, one for transferors. *Leary* should not be evaded by blurring the two into one another.

In a somewhat analogous case, Lambert v. United States, 101 F.2d 960 (5th Cir. 1939), this court, on its own motion, discovered that the defendant had been convicted of conspiracy to sell morphine when all evidence indicated that he had acted in concert with the *buyer.* In the absence of proof that the defendant acted with the *sellers* to effect the sale, his conviction was held "manifestly unjust." The same characterization seems to me required in the instant case.

A thorough review of the records of both trials has uncovered absolutely no evidence of a "transfer" in Georgia on or about October 10, 1970, within my understanding of the meaning of § 4742(a). To me, the records compel the conclusion, moreover, that even if a requisite transfer did take place appellants were on the receiving end and cannot be convicted as "transferors."

Viewing the evidence most favorably to the government, appellants employed the pilot Sims, assisted by various undercover agents and informers, to fly to Jamaica and pick up marijuana purchased there by Richard Dimarzo according to instructions and with money furnished him by appellants. As instructed, Dimarzo paid the purchase price to his prearranged contact in Jamaica and saw that the marijuana was loaded aboard the plane. Dimarzo then joined Sims, his co-pilot and undercover agent Richel on the flight back to the States. When they landed at Fulton County Airport in Atlanta on the afternoon of October 10, Register and Hornsby were waiting with a rental van. The marijuana was unloaded into the van, which Hornsby drove away, followed by Register, until they were stopped and arrested.

The conclusion seems inescapable that those on the airplane were brought into the conspiracy as agents to pick up the contraband in Jamaica and deliver it to the organizers in the United States. As such, they did not "transfer" it to appellants within the meaning of § 4742(a) —any more than a "transfer" would occur each time a conspirator handed the

dope to a co-conspirator in transit prior to its ultimate "transfer" to a purchaser. I do not believe that this is the sort of taxable incident contemplated by the statutory scheme. Neither Sims, Dimarzo, or anyone else sent by the conspiracy to Jamaica "possessed" the contraband in his individual capacity; each handled it only as partner [2] and agent of the conspiracy.

In Good v. United States, 410 F.2d 1217 (5th Cir. 1969), cited by the majority in upholding the convictions on Count Three, we took pains to distinguish that case, in which there were ". . . two distinct groups of people, the Mexican smugglers at one end and the American transferees at the other," from the previous case of Marquez-Anaya v. United States, 319 F.2d 610 (5th Cir. 1963), in which there was ". . . substantially an uninterrupted movement of the narcotics with no real transfer." 410 F.2d at 1223. Here, unlike in Good, but as in Marquez-Anaya, the transferees did control the importation. I have no problem deciding which case ours more resembles.

A further anomaly in the majority's reliance on Good is that there the defendant was convicted as a transferee rather than as a transferor. Here, even were the loading of the marijuana from the plane to the van viewed as a "transfer," Hornsby, Register and Cochran should not be convicted of aiding and abetting that "transfer" to themselves by their agents. Within the conspiracy, they were the recipients, not the transferors. If any persons were transferors at the airport, they were the pilot and his crew who delivered the contraband to Hornsby and Register.

I would treat these convictions under Count Three of the indictment as plain error under Rule 52(b), Federal Rules of Criminal Procedure. This would be necessary because defense counsel never

called the inapplicability of § 4742(a) to the trial court's attention; indeed, they did not call it to ours. Defendants moved to dismiss only Counts One and Two and have sufficiently expanded on appeal their arguments against these first two counts to expose their misunderstanding of the application of Leary to the old marijuana laws. Indeed, counsel for Hornsby and Cochran were so unaware of the essential elements of a § 4742(a) offense that, when the jury asked for a definition of the word "transfer," they made no objection to a lengthy definition given by the trial court which essentially said that "transfer" meant "to get from one place or one person to another." The only individual who the record reflects grasped the significance of the term was a juror who persistently pressed the court for a distinction between "transfer" and "transport" and "import." Unfortunately, the court's responses to this juror only blurred the critical distinction. At Register's trial, no juror was so perceptive; there the jury found guilt on all three counts unguided by any definition of the word "transfer." I would fault no one for failure to unravel the intricacies of the old Marijuana Tax Act in the heat of trial. The more measured consideration possible here, however, makes this error plain to me. Rule 52(b) exists to prevent such a clear miscarriage of justice. See Wright, Federal Practice and Procedure: Criminal, § 856, and cases cited therein.

### COUNT ONE

Count One of the indictment charges:

That, beginning on or about September, 1970 and continuing to on or about October 21, 1970 in the Northern District of Georgia and elsewhere, in violation of Section 7237, Title 26, U.S.C., Gerald McNally a/k/a Gerry, Richard F. Dimarzo a/k/a Dick

---

2. Characterizing the conspiracy as a partnership, as has often been done—see Ong Way Jong v. United States, 245 F.2d 392 (9th Cir. 1957); United States v. Rollnick, 91 F. 2d 911 (2d Cir. 1937); Short v. United States, 91 F.2d 614 (4th Cir. 1937)—the marijuana would be analogous to "partnership property" possessed by partners as agents for partnership purposes.

Roberts, Lawrence Register a/k/a Larry Regenstein, James Burnett, Jimmy Ginn, Fred Hornsby and Daniel John Cochran a/k/a Danny, defendants herein, did unlawfully, willfully and knowingly combine, conspire, confederate and agree together and with each other and with Henry F. Maierhoffer and James Mobley, not named as defendants herein but named as co-conspirators and with various other persons whose names are to the Grand Jury unknown, to commit offenses against the laws of the United States, that is, to obtain, acquire, transport, conceal and facilitate the transportation and concealment of marijuana, in violation of Sections 4741 through 4744, Title 26, United States Code.

It goes on to charge numerous overt acts performed in furtherance of the conspiracy.

The crime charged in Count One was phrased in the language of 26 U.S.C. § 4744(a)—the "transferee" section of the Tax Act which *Leary* held invalid in the face of a Fifth Amendment claim. With the *Leary* holding in mind, defendant Cochran asserted his Fifth Amendment right and at various stages of the proceedings asked the court to dismiss Count One of the indictment. Perhaps discouraged by Cochran's failure to prevail on the point, the other defendants made no attacks on the indictment prior to appeal. They, therefore, are essentially asking that we treat their convictions under Count One as plain error.

The trial court's response to *Leary* was simply to strike the inclusion of § 4744 from Count One and, when it instructed each jury in the language of the indictment, merely to charge it in terms of a conspiracy to transport, etc., " . . . in violation of Sections 4741 through 4743 of Title 26, United States Code." The court then went on to give the jurors brief summaries of these three sections. Fundamentally the same instructions on Count One were given at both trials. The problem is that only §

4742(a) creates a criminal offense—that of transferring marijuana not pursuant to a written order form furnished by the transferee. Count One does not charge these men with conspiracy to "transfer" marijuana in violation of §§ 4741–4743. It charges them with conspiracy to "transport." Pressed by a juror at Hornsby's and Cochran's trial, the judge emphasized that "transport" and "transfer" had quite different meanings in the context of the charge. I agree. After *Leary* and prior to the enactment of new statutes, persons who asserted their Fifth Amendment rights could not be convicted in federal court of transporting marijuana, or obtaining, acquiring, or concealing it, or facilitating such— except as part of a transfer. And no conspiracy to transfer was alleged.

Even if Count One be construed to charge a conspiracy to transport *by means of* a transfer not pursuant to the required forms, it still should not stand. Having been instructed in Count Three concerning an alleged transfer on October 10, there is the greatest likelihood that, if the jurors looked for the transfer which was the object of the conspiracy, they would focus on the loading of the marijuana from the plane to the truck—which I think was not a transfer within the meaning of § 4742(a). Some possibility perhaps exists that ingenious jurors would find, from the great amount of marijuana involved, a conspiracy to transport by means of an illegal transfer at some point in the future. But there was virtually no testimony concerning the conspirators' future plans for the dope and no instruction bearing on possession with intent to distribute which would make this train of thought more likely. I cannot say with a straight face that Count One stood much chance of apprising the defendants of the charge against them or, as read in the jury instructions, adequately advised the jurors of the elements of the offense under the only valid reading of this Count. I would, therefore, find plain error.