660 F.2d 547
 9 Fed. R. Evid. Serv. 490
 UNITED STATES of America, Plaintiff-Appellee,
v.
Ralph POOL, Carl Billy Knowles, Brad William Tarpley, Marvin
Paul Leask, Charles Thomas Purcell, Edward
Frederick Petrulla, Arthur John Loye,
and Geoffrey Bain Tannhauser,
Defendants-Appellants.
 No. 79-5242.
 United States Court of Appeals,
Fifth Circuit.
 
 Unit B*
 Nov. 2, 1981.
Rehearing Denied Jan. 28, 1982.
 Curtis Fallgatter, Asst. U.S. Atty., Jacksonville, Fla., for plaintiff-appellee.
 Martin Weinberg, Boston, Mass., Reese A. Waters, Jr., Orange Park, Fla. (Court-appointed), for Pool and Petrulla.
 Carlton P. Maddox, Jacksonville, Fla., for Knowles.
 Archibald J. Thomas, III, Asst. Federal Public Defender, Jacksonville, Fla., for Tarpley.
 Joseph H. Kelinson, Coconut Grove, Fla. (Court-appointed), for Leask.
 Michael J. Doddo, Fort Lauderdale, Fla., for Loye.
 Jack R. Blumenfeld, Coconut Grove, Fla., James K. Jenkins, Atlanta, Ga., for Tannhauser.
 Moran & Gold, Sheryl Javits, Miami, Fla., for Petrulla.
 Gerald H. Goldstein, San Antonio, Tex., for Purcell.
 Edward F. Petrulla, pro se.
 Appeal from the United States District Court for the Middle District of Florida.
 Before HILL, KRAVITCH and HATCHETT, Circuit Judges.
 JAMES C. HILL, Circuit Judge:
 
 
 1
 A jury found beyond a reasonable doubt that the eight appellants participated in a scheme to import approximately 225,000 pounds of marijuana worth $60,000,000 into the United States.
 
 
 2
 Specifically, all eight were convicted of conspiracy to import marijuana. 21 U.S.C. § 963 (West 1972) (Count 1). Appellants Petrulla, Purcell, Tannhauser, Knowles, Loye, and Pool were also found guilty of conspiring to possess marijuana with intent to distribute. 21 U.S.C. § 846 (West 1972) (Count II). In addition, Petrulla was convicted of five counts of using a telephone to facilitate the commission of a Title 21 violation. 21 U.S.C. § 843(b) (West 1972) (Counts 4, 5, 6, 7 and 10). Purcell, Knowles, Loye, and Tannhauser were each convicted of one § 843(b) violation. (Counts 2, 8, 9 and 10 respectively).
 
 I. The Issues
 Appellants raise twelve issues:
 
 3
 (1) Whether the district court may properly consider, as one factor in imposing sentence, the refusal of several appellants to cooperate with the government's investigation of the same criminal scheme from which their convictions arise?
 
 
 4
 (2) Whether several appellants were prevented from developing an entrapment defense because: (a) the court improperly restricted the cross examination of a government informant, Ed Allen, and (b) whether the court failed to disclose "highly relevant" in camera testimony of another informant?
 
 
 5
 (3) Whether the trial court erred in giving a partial entrapment instruction?
 
 
 6
 (4) Whether the trial court erred in giving a limiting instruction that characterized a statement of appellant Petrulla as an admission or incriminatory statement?
 
 
 7
 (5) Whether the trial court erred in imposing consecutive sentences on several appellants for conspiracy to import and conspiracy to possess with intent to distribute?
 
 
 8
 (6) Whether the proof of an overt act is required to convict for conspiracy to import and for conspiracy to possess with intent to distribute?
 
 
 9
 (7) Whether the testimony of a DEA special agent that identified a caller whose voice he had never heard based solely on the caller's self-identification is admissible?
 
 
 10
 (8) Whether the evidence is sufficient to convict appellants Loye and Leask of conspiracy to import; to convict appellants Loye and Tannhauser of conspiracy to possess with intent to distribute; and to convict Loye of § 843(b)?
 
 
 11
 (9) Whether it is legally impossible to violate § 843(b) by telephoning a federal agent?
 
 
 12
 (10) Whether it was proper for the trial court to restrict Loye's counsel from arguing that Petrulla and Purcell were responsible for the § 843(b) count for which Loye was charged?
 
 
 13
 (11) Whether the trial court erred in denying the severance motions of Leask, Loye, Tarpley, and Pool?
 
 
 14
 (12) Whether certain testimony was admitted in violation of the rules against hearsay?
 
 
 15
 For the reasons set out below, we affirm the jury's verdict in all but one respect. The evidence is insufficient to convict appellant Loye of Count 9. We also affirm the sentencing considerations of the trial judge.
 
 II. The Facts
 
 16
 This case is a testament to the excellent and resourceful work of the Drug Enforcement Administration (DEA). Through skillful undercover infiltration, several DEA agents were able to monitor the appellants' constantly changing plans to import marijuana into this country. Ultimately, the appellants were arrested while attempting to import $60,000,000 of marijuana. We set out the facts in some detail to accurately portray each appellant's role in the scheme.
 
 
 17
 On April 20, 1978, DEA agent Weed met appellant Purcell. Purcell asked if Weed could "off-load" some marijuana coming from Colombia. Informant Ed Allen was present at this meeting.
 
 
 18
 On June 5, 1978 DEA agents Story and Weed met Purcell in Miami, Florida. Purcell introduced them to "Chuck" and "Dale." Chuck and Dale were to arrange for a freighter to bring 10,000 pounds of marijuana to a point approximately 50 miles off the coast of Florida. Story and Weed were to provide the "off-load" boats necessary to bring the marijuana to shore. Purcell was to examine an alternate off-load site suggested by the agents. The next day, June 6, Purcell examined the alternate site, actually suggested by the agents to enhance DEA surveillance, and pronounced it ideal.
 
 
 19
 A month later, on July 6, agents Story and Weed again met with Purcell. Purcell stated that he had just returned from Colombia where he had paid $15,000 to obtain the necessary protection to move the marijuana from the shore area of the Colombian coast. He also mentioned that "Jeff," later identified as appellant Tannhauser, was going to Colombia with an additional $10,000 of protection money. Purcell also said that Chuck and Dale were no longer in the deal because "they had cheated his man out of some money" and that 42,000 pounds of marijuana would be coming from Colombia. Purcell's passport showed entry/exit dates for Colombia, South America on June 21, and July 1, 1978.
 
 
 20
 On July 10, Purcell introduced the agents to "his man," appellant Petrulla. Petrulla explained that Tannhauser was in Colombia making final arrangements for the marijuana load which would be 40,000 to 60,000 pounds. Petrulla also stated that he wanted to view Story and Weed's off-load boat, the LADY ELIZABETH. Finally, he told the agents that the marijuana would be stored at a chicken farm in St. Augustine, Florida owned by appellant Knowles.
 
 
 21
 On July 12, 1978, Knowles took Agent Weed, Petrulla, and Purcell to possible places for the off-load boats to land. Knowles also showed them his chicken farm and noted that the chicken manure would mask the odor of the marijuana as it had been effective in doing before. Petrulla then explained that the "mother ship," the freighter bringing the marijuana from Colombia, would be off-loaded sixty-five miles off the shore of St. Augustine. He also explained that he had two buyers coming from Georgia and Alabama with $2,000,000 cash.
 
 
 22
 On July 21, Purcell told Story and Weed that Tannhauser had called the previous night and that the captain of the Colombian mother ship had backed out.
 
 
 23
 On July 24, Purcell told Weed and Story that the deal was on again and that Petrulla wanted Weed to move his off-load boat, the LADY ELIZABETH, from Miami to St. Augustine immediately. Purcell also gave Weed $1,500 which he said came from Petrulla. On the evening of July 24 Weed and Purcell moved the LADY ELIZABETH to St. Augustine. Subsequently, Purcell decided that in the small town of St. Augustine attention might be drawn to their operation; hence, the operation should be moved to Jacksonville.
 
 
 24
 On July 27, Story, Weed, Petrulla, Purcell, Tannhauser, and Knowles met at the St. Augustine Holiday Inn. Tannhauser, having just arrived from Colombia, brought news of the mother ship. He explained that 100,000 pounds of marijuana would be off-loaded in the South Caicos Islands, 90 miles off Puerto Rico. Petrulla added that this was a positive development because if the Coast Guard were watching, the mother ship would be seized at this point. Tannhauser then explained he would be the first person to contact the mother ship because he would have to match one half of a five-peso note with "Miguel," the captain of the mother ship. Tannhauser then gave his half of the five-peso note to Petrulla. Petrulla then asked Weed if he could acquire a third off-load boat because they would be off-loading 80,000 pounds. Tannhauser then described the mother ship and produced nautical charts showing that the rendezvous with the mother ship would occur approximately 250 miles east-southeast of Jacksonville. Petrulla also gave Weed another $2,500 for the off-load boats and advised Weed that he still had $1,000 coming. Finally, concern was expressed that "pirates" might try to raid the off-load boats.
 
 
 25
 On July 28, Weed called Petrulla and said he would be able to rent a third off-load boat for $5,000. Over the next several days Petrulla met with his Colombian connections and Knowles arranged for a tractor trailer to move the marijuana from the Florida shore to his home.
 
 
 26
 On August 1, Petrulla advised Weed that there would be a two day delay because the Puerto Rican group was having difficulty off-loading their 100,000 pounds. Petrulla also explained that "Chips," appellant Loye, would be arriving in Jacksonville with $6,000 for Weed. Weed and Purcell met Loye at Jacksonville International Airport. In the presence of Story and Purcell, Loye gave Weed $6,000 that he said was from Petrulla. Loye then returned to Miami to assist Petrulla.
 
 
 27
 On August 3, Knowles showed Weed a new barn on his farm which Petrulla gave him $2,000 to build. Knowles told Weed to make sure that none of Weed's men jumped off the off-load boats and ran down the pier to make any telephone calls because Knowles' men had been instructed to shoot anyone making sudden phone calls. Knowles also told Weed that he would sell Weed's share of the marijuana if Purcell did not. Thereafter Petrulla called and informed both men that the plan was to proceed.
 
 
 28
 At approximately 11:30 on August 3, Story, Weed, and Knowles went to Jacksonville International Airport to pick up Petrulla's additional off-load men. Tannhauser arrived in the company of appellant Leask and Robert Allen, who plead guilty before trial. Appellant Tarpley approached the group as they proceeded to the baggage claim area and was introduced to agent Story as "Brad." Tarpley gave Story his ticket, said his baggage had been lost, and asked Story to claim it for him. The ticket was for one Mr. B. Wells.
 
 
 29
 Purcell, Tannhauser, Knowles, Leask, Tarpley (and Robert Allen) met shortly thereafter at an adjacent motel. Tannhauser explained the off-load plans to the group in great detail. During that meeting Robert Allen asked Tarpley what name his claim ticket was in and Tarpley responded "I don't know which name I used this time."
 
 
 30
 On August 4 at approximately 2:30 a. m. the three off-load vessels disembarked from Mayport for the rendezvous with the mother ship. All three off-load vessels developed mechanical problems. During this time, Story told Petrulla that Weed had acquired and was aboard a fourth boat trying to reach the mother ship. This story was entirely fictitious. The agents were simply trying to assure that they would have access to all future information about the conspiracy.
 
 
 31
 Tannhauser was seen by DEA agents aboard the LADY ELIZABETH with two envelopes each of which contained American currency about 3/4 of an inch thick. When Tannhauser returned to shore and was told that Weed was out in a fourth (fictitious) off-load boat he stated that Weed would get blown away if he (Tannhauser) were not there when the mother ship was reached. Meanwhile, Petrulla and Knowles went out in a private aircraft searching for Weed and the fictitious, fourth boat. Petrulla was extremely angry with the execution of the plan and threatened that someone would get hurt if the deal went sour.
 
 
 32
 On August 5 at approximately 9:30 p. m. Story, DEA Agent Starratt, Purcell, Tannhauser, Leask, Tarpley and Robert Allen met on the dock after returning from sea. Later they all met at a Quality Inn in Jacksonville. There, they encountered Petrulla, Knowles and appellant Pool. Petrulla had a heated conversation with Story about why none of Petrulla's people were on Weed's boat. With Pool standing several feet away, the conversation became very loud. At one point Petrulla told Story he had been out flying with his pilot and Knowles and then motioned to Pool and Knowles. Documentary evidence showed that Pool had rented an airplane that day of the sort described by Petrulla and that Pool did not return any of the fuel receipts.
 
 
 33
 While still at the Quality Inn, Petrulla stated that he wanted to get some of his people on board the fourth off-load boat (supposedly manned by Weed) and suggested getting a helicopter to fly Tannhauser out to Weed's boat. Story said he did not believe a helicopter had that kind of range. Story then observed Pool shaking his head. Petrulla's anxiety then led to the Chaplinseque proposal of parachuting Tannhauser onto this fourth, non-existent load boat. Tannhauser agreed to this plan. Finally, Petrulla and Purcell stated that certain off-load people, who were actually undercover agents, were unacceptable and should not be aboard any subsequent off-load attempts.
 
 
 34
 On August 7, a series of telephone conversations between the agents and the appellants were taped. These calls formed the basis of the § 843(b) charges. Knowles called agent Story because he thought Petrulla was trying to cut them out of the deal. Petrulla called Story and denied this. Story spoke with Tannhauser who said he had no information. Story then phoned Purcell who said he was standing by with several of his "ground boys." He told Story to reach him again by having "Larry Roach" paged at the front desk. Later, Tannhauser called Agent Starratt and said the mother ship was being followed and that he should get Weed into the coast.
 
 
 35
 On August 9, 1978 Story and Starratt arrived at Knowles chicken farm and Knowles and Pool were there. The operation was discussed in full. Pool also stated he had flown twice with Petrulla and Knowles on August 5. Pool asked Story if he was the "Purple Fox" and if he was the one they had talked to in the aircraft.
 
 
 36
 Beginning on August 5 at 8:00 p. m. the United States Coast Guard Cutter CAPE GULL placed the HEIDI, a 160-foot coastal freighter, under surveillance. During the period in question, the Coast Guard identified only one vessel matching the description of the HEIDI within the Atlantic Ocean surveillance area from Puerto Rico to the North and South Carolina border. The color, description, and configuration of the HEIDI exactly matched the description and sketch possessed by Tannhauser, as did the description of the cargo and its method of loading. Citizens band radios with channel 14, the channel Tannhauser intended to use to communicate with Miguel, were found on board. An outgoing radio message was found on board the HEIDI stating that the HEIDI was being followed by the United States Coast Guard and asking for instructions. In addition, the nautical charts found aboard the HEIDI reflected a path of travel described by the conspirators. The Coast Guard discovered 225,000 pounds of marijuana worth $60,000,000 on the HEIDI.
 
 III. Discussion
 A. The Sentencing
 
 37
 In sentencing appellant Petrulla the trial judge stated:
 
 
 38
 ... I would expect a Rule 35 motion to be filed. And when it's received, then the Court will then take it under consideration and we'll consider Mr. Petrulla's position at that time as to whether this sentence should be reduced or not.
 
 
 39
 I would again state to you that this court is of the opinion that not all of those parties who were involved in this conspiracy were before the bar of justice. And I just think you're intelligent enough to know what the court is thinking, and particularly you Mr. Petrulla. All of the evidence indicates as well as the presentence investigation report that you were, if not one of the major co-conspirators in this case, much of the organization is through your efforts. And it indicates to the court that there were others involved, not under the evidence but the background information that I have as to you individually.
 
 
 40
 I've kept that in mind in imposing this sentence.
 
 
 41
 The trial judge made the same point to appellate Purcell immediately after he was sentenced. The following colloquy occurred:
 
 
 42
 THE COURT: ... I would say this to you, and I may say it to some of the others here today. I would expect and it's normally the case that a Rule 35 motion will be made, which is a motion for reduction of sentence. I'm sure your attorney can explain that to you. At that time the court will take that under consideration.
 
 
 43
 I might indicate to you that the court feels that all of the parties that were involved in this conspiracy were not before the court. And if in some manner you could, you were helpful to the government and the court in seeing that others who might have been involved are brought to the bar of justice, the court could consider that in any subsequent motion.
 
 
 44
 THE DEFENDANT: Your Honor, may I establish one thing? I'm not quite sure I understood exactly what you last said in regard to cooperation and in regard to furthering your judgment on these other gentlemen.
 
 Does that mean that I am implicated in
 
 45
 THE COURT: I'm not referring to any other co-defendants.
 
 
 46
 THE DEFENDANT: Are you referring to any other person at all?
 
 
 47
 THE COURT: I'm referring to I indicated I thought I made it very clear that this court is of the opinion that all of the parties that were involved in this conspiracy were not brought before this court. I think your attorney understands.
 
 
 48
 MR. BERK: Yes, I do, Your Honor.
 
 
 49
 THE DEFENDANT: That's why I took the liberty to ask you. Because I did not thoroughly understand what you meant.
 
 
 50
 Later, Purcell told the court that he would only speak about his own role in the conspiracy:
 
 
 51
 THE DEFENDANT: That's the only thing I feel like I'm qualified to make statements about.
 
 And he asked me why
 
 52
 THE COURT: You don't feel like you're qualified to make statements about the others who may have been involved in this matter other than yourself?
 
 
 53
 THE DEFENDANT: I'm speaking only for and about myself.
 
 
 54
 THE COURT: All right. Is that because of advice of counsel?
 
 
 55
 THE DEFENDANT: No sir. That's because of a moral conviction that I have and I've always had. And I don't know how the court will look upon that.
 
 
 56
 In sentencing appellant Tannhauser the court simply stated:
 
 
 57
 THE COURT: And, Mr. Tannhauser, I'm not going to repeat myself as to each defendant now, but again I much that I've said to the others applies to you.
 
 
 58
 At another point the trial judge added;
 
 
 59
 THE COURT: ... and I would tell you the same thing I told the others on the Rule 35 Motion. And you can explain that to him.
 
 
 60
 MR. BLUMENFELD: Thank you.
 
 
 61
 Appellants Petrulla, Purcell and Tannhauser contend that these comments by the trial judge are an unconstitutional attempt to coerce their cooperation.[1] Specifically, they argue that they are being punished for exercising their Fifth Amendment privilege against self-incrimination. The government retorts that the trial court did not make its Rule 35 comments until after the sentences were imposed. Hence the government argues that the appellants were not punished for their failure to cooperate. Rather, the court was merely indicating its willingness to reward the appellants with leniency if they cooperated.
 
 
 62
 Roberts v. United States, 445 U.S. 552, 100 S.Ct. 1358, 63 L.Ed.2d 622 (1980) provides the framework for our resolution of this issue. Roberts squarely holds that the district court may properly consider, as one factor in imposing sentence, a defendant's refusal to cooperate with an ongoing investigation of the criminal scheme of which the defendant was a part. Id. at 1362-1365. The Court noted that the "deeply rooted social obligation (to cooperate with the government) is not diminished when the witness to crime is involved in illicit activities himself." Id. at 1363. Furthermore, cooperation "bears a rational connection to a defendant's willingness to shape up and change his behavior." Id. Failure to cooperate "remains a badge of irresponsible citizenship." Id.
 
 
 63
 Although the petitioner in Roberts did not strenuously contest that his failure to cooperate was a relevant sentencing factor, he did argue, as is argued here, that the district court had punished him for exercising his Fifth Amendment privilege against compelled self-incrimination. He also contended that his refusal to cooperate stemmed from legitimate fears of physical retaliation.
 
 In response, the Court found that:
 
 64
 These arguments would have merited serious consideration if they had been presented properly to the sentencing judge. But the mere possibility of unarticulated explanations or excuses for antisocial conduct does not make that conduct irrelevant to the sentencing decision. The District Court had no opportunity to consider the theories that petitioner now advances, for each was raised for the first time in petitioner's appellate brief. Although petitioner knew that his intransigency would be used against him, neither he nor his lawyer offered any explanation to the sentencing court.
 
 
 65
 Id. at 1364.
 
 
 66
 The Court went on to note that the Fifth Amendment privilege against compelled self-incrimination is not self-executing. Further, the privilege "must be deemed waived if not in some manner brought to the attention of the tribunal which must pass upon it." Id., quoting Vajtauer v. Commissioner of Immigration, 273 U.S. 103, 113, 47 S.Ct. 302, 306, 71 L.Ed. 560 (1927). The Court concluded that "if petitioner believed that his failure to cooperate was privileged, he should have said so at a time when the sentencing court could have determined whether his claim was legitimate." 100 S.Ct. at 1364. Accordingly, Roberts' sentence was affirmed.
 
 
 67
 The facts are virtually identical here. None of the appellants raised a Fifth Amendment claim at the time of sentencing. Indeed, appellant Purcell indicated that his refusal to cooperate was based on the "moral conviction" that he should not implicate others. Appellant Petrulla's brief develops a number of ways in which his Fifth Amendment right to silence could have been violated. Brief of Petrulla at 21-22. However, just as in Roberts, these arguments were raised for the first time on appeal. Thus, through the appellant's fault the sentencing judge was denied the opportunity to review these arguments. In sum, our conclusion is identical to the Roberts Court. The appellants failed to assert their Fifth Amendment right to be free of compelled self-incrimination in a timely fashion. Hence, it must be considered waived.[2]
 
 
 68
 In one respect, however, the sentencing in this case goes beyond the Roberts case. Specifically the trial judge made reference to his willingness to consider the appellants' cooperation with the government in a Rule 35 motion. See Fed.R.Crim.P. 35 (court may reduce sentence within 120 days after judgment of conviction affirmed). A Rule 35 motion is filed after the defendant's conviction is final. Hence, the defendant's ability to explain his silence on Fifth Amendment grounds is diminished by "the ordinary rule ( ) that once a person is convicted of a crime, he no longer has the privilege against self-incrimination as he can no longer be incriminated by his testimony about said crime ...." Reina v. United States, 364 U.S. 507, 513, 81 S.Ct. 260, 264, 5 L.Ed.2d 249 (1960). The Supreme Court noted that "(t)here is indeed weighty authority for that proposition." Id. See 8 Wigmore, Evidence § 2279 (3d ed. 1940). We need not develop the outer limits of this doctrine here. Roberts has declared that a defendant's refusal to cooperate may be considered in imposing sentence; a fortiori it may be considered in a Rule 35 motion. Perhaps appellants will raise a timely Fifth Amendment claim when they file Rule 35 motions, assuming such a claim is possible under Reina. It is sufficient for the disposition of this case, however, that appellants have presented no timely Fifth Amendment claim here. Accordingly, the appellants' sentences are affirmed.[3]
 
 B. Informants' Information
 
 69
 Appellants Petrulla and Loye contend that their cross-examination of DEA agents regarding informant Ed Allen was improperly restricted. Hence, they were unable to develop an entrapment defense by showing that Allen was a "double-dealer" who would create a criminal scheme.
 
 
 70
 The record reveals this contention to be without merit. "The extent of cross-examination with respect to an appropriate subject of inquiry is within the sound discretion of the trial court." Alford v. United States, 282 U.S. 687, 694, 51 S.Ct. 218, 220, 75 L.Ed. 624 (1931). Here, the record shows that the trial court permitted extensive cross-examination of all government witnesses on all aspects of Allen's background. Furthermore, defense counsel acknowledged that they could call agents (particularly Agent Weed) back as their own witnesses. The trial court sanctioned this procedure. Finally, defense counsel actually had informant Allen under subpoena but failed to call him. We have previously agreed with the Second Circuit that "particularly in view of the defense decision not to call (the informer), these questions (raised by defense counsel) do not appear sufficiently likely to have developed evidence that would have significantly weakened the Government's case." United States v. Ramirez, 533 F.2d 138, 141 (5th Cir. 1976), quoting United States v. Jones, 360 F.2d 92, 96 (2d Cir. 1966). In sum, if defense counsel failed to develop an entrapment defense based on informant Allen's activities it was through their own fault.
 
 
 71
 Appellants Petrulla, Loye, Pool, and Tarpley contend that the government and the court "both failed to disclose to defense counsel (information concerning the in camera testimony of informant Roberto Collazo that) surely would have been, by itself, the capstone of a proper showing sufficient to have permitted an entrapment defense to have matured." Brief of Appellant Petrulla at 40 (emphasis in original). This argument is frivolous.
 
 
 72
 The record shows that there were no prohibitions placed on the ability of defense counsel to place the Collazo information in evidence and that such evidence was presented through the hearsay testimony of DEA agent Story, a procedure employed at the urging of the defense. Furthermore, defense counsel had Collazo under subpoena and excused him. See Ramirez, 533 F.2d at 141. Again, any failure to develop an entrapment defense was solely that of defense counsel.
 
 C. Partial Entrapment Instructions
 
 73
 Appellants Petrulla, Purcell Tannhauser, Knowles, Loye, and Tarpley argue that it was reversible error for the court to give a partial entrapment instruction after the closing arguments. Again, the record does not support the appellants' argument.
 
 
 74
 Before defense counsel's closing arguments the court noted:
 
 
 75
 THE COURT: There's a fine line here, obviously. I don't think you're entitled to argue what amounts to entrapment. And, yet, there is in evidence the matters about supplying the boats and so forth which actually came in, as I recollect, in the government's case ....
 
 
 76
 I'll just have to rule when the occasion arises.
 
 
 77
 Record, Vol. II, at 149.
 
 
 78
 In addition, the court permitted the government to reserve the right to request the following instruction:
 
 
 79
 The law provides that it is proper for a government agent to pretend to be someone else and to offer either directly or through an informer or other decoy to engage in an unlawful transaction.
 
 
 80
 Id. at 149-50.
 
 
 81
 During his closing statement, Petrulla's counsel argued that Petrulla had not formed the specific intent to commit the crimes with which he was charged because of the heavy government involvement in the case. In effect, Petrulla's counsel argued that his client was entrapped.
 
 
 82
 In response to this argument the court found:
 
 
 83
 And the Court is convinced that the argument that you (counsel for Petrulla) made amounted to an argument that by the actions of the government agents there was an inducement that went to the intent of your client. And I think absent the affirmative defense of entrapment that that was improper. Therefore, I think that this instruction (set out above) should be given as a matter of fairness.
 
 
 84
 Record, Vol. 18, at 67.
 
 
 85
 We find no error in the trial court's decision. The purpose of Federal Rule of Criminal Procedure 30 requirement that counsel be informed of the court's proposed action on requested charges before arguments to the jury "is that counsel, fairly advised, may intelligibly argue." United States v. Davis, 583 F.2d 190, 195 n.4 (5th Cir. 1978). Here, Petrulla's counsel had been informed by the court that he could not argue entrapment to the jury. Petrulla's counsel also knew that if he so argued the government had reserved an entrapment instruction to protect its case. Nonetheless, Petrulla's counsel transgressed the trial court's admonition not to argue entrapment. When he did so he was fully informed of what the consequences of his action would be.
 
 
 86
 The purpose of Rule 30 was further served when counsel for Petrulla was afforded the opportunity to reopen his argument upon being notified that the court intended to give the complained of instruction. In addition, the seven remaining defense counsel gave their closing arguments after the trial court had ruled that he would give the instruction in question. In light of these facts, we conclude that neither the letter nor the spirit of Rule 30 was violated by the district court's instruction.
 
 
 87
 Furthermore, we find the content of the court's instruction to be without error. The trial judge is given substantial latitude in tailoring the instructions so long as they fairly and adequately cover the issues presented. See United States v. James, 576 F.2d 223, 226 (9th Cir. 1978). Equally important, the propriety of a given instruction, or the failure to give a particular instruction, is not reviewed in the abstract; rather, the adequacy of the entire charge taken in the context of the whole trial is our proper scope of inquiry. United States v. Park, 421 U.S. 658, 674-75, 95 S.Ct. 1903, 1912-13, 44 L.Ed.2d 489. Our review of the record reveals that the trial judge's instruction was carefully tailored to minimize any prejudice caused by Petrulla's counsel improperly arguing entrapment to the jury.
 
 
 88
 Finally, we reject the appellants' contention that the government failed to raise a timely objection to counsel for Petrulla's closing argument. The government made its concern regarding entrapment known to the trial judge before the closing arguments began. It also renewed its objection at the close of Petrulla's argument. It was not necessary for the government to interrupt Petrulla's counsel in mid-sentence to preserve its objection. As we have noted on a previous occasion:
 
 
 89
 The procedure for requesting charges, and for objections, 'should not be employed woodenly, but should be applied where its application will serve the ends for which it was designed. If it be applied blindly and without the benefit of analysis of particular fact situations before individual courts in specific cases it will be transformed from a sound principle of judicial administration into a trap for the unwary, a trap reminiscent of the senseless technicalities that characterized common law procedural systems and which made them a source of scorn and anger to many lawyers and to most laymen.'
 
 
 90
 United States v. Davis, 583 F.2d 190, 195 (5th Cir. 1978); see United States v. Currens, 290 F.2d 751, 759 (3d Cir. 1961).
 
 
 91
 D. Limiting Instruction of Petrulla's Extrajudicial Statement
 
 
 92
 Appellant Petrulla challenges a limiting instruction based on the following direct examination of DEA Agent Story:
 
 
 93
 Q. Mr. Story, I was asking you about a conversation with Mr. Petrulla on August the 8th at 9:45 a.m. And in that conversation did you discuss with him anything about the freighter?
 
 
 94
 A. Yes, sir, I did.
 
 
 95
 He stated the freighter was approximately 80 miles off the Grand Bahama Bank.
 
 
 96
 ... He indicated the freighter was low on fuel.
 
 
 97
 Mr. Petrulla advised me that the freighter was well, he did not refer to it as a freighter. He said it's just hanging around, was the word that he used, in the vicinity of 80 miles north of the Bahamas because of a delay that we had, the offload boats. When they learned of the problem, they were just hanging around a couple of days.
 
 
 98
 And when I asked where, he said 80 miles north of the Grand Bahama Bank.
 
 
 99
 Record, Vol. 3, 132-134.
 
 
 100
 Pursuant to this examination the court instructed.
 
 
 101
 THE COURT: All right. Ladies and gentlemen, as to that statement alleged to have been made by defendant Petrulla, I would like you to be guided in your considering that by this instruction:
 
 
 102
 An admission or incriminatory statement made or act done by one defendant outside of court may not be considered as evidence against another defendant who was not present and so did not see the act done or heard the statement made.
 
 
 103
 So the last statement made or attributed to Mr. Petrulla by this witness was made outside of the court but not in the presence of any of these other defendants and should not be considered as evidence against the other defendants.
 
 
 104
 Petrulla contends that the underlined portion of the above instruction "effectively directed a guilty verdict on one aspect of Petrulla's participation in the conspiracy." Brief of Petrulla at 61.
 
 
 105
 Petrulla did not raise the objection during trial.[4] Hence, reversal is appropriate only if it can overcome the heavy burden of showing that the district court committed plain error. Fed.R.Crim.P. 52(b); see United States v. Roger, 465 F.2d 996 (5th Cir. 1972). The appellant has not met this heavy burden here. The trial court's instruction refers to the appellant's "alleged" statement. Furthermore, a complete reading shows that the trial court has merely explained the general law of out-of-court admissions. See Devitt and Blackmar, Federal Jury Practice and Instructions (3d ed.) §§ 15.06, 15.07. The court's instruction cannot be stretched into an adjudication of guilt. Appellant relies on United States v. Brandom, 479 F.2d 830 (8th Cir. 1973) in making his argument. In Brandom the trial judge's "statement made it clear to the jury that, in the trial judge's opinion, the government had produced proof beyond a reasonable doubt of two of the three essential elements of the offense ...." Id. at 833. The trial judge here made no such conclusory statement about the appellant's guilt. Rather, we find that he simply gave a legally proper instruction to the jury about an out-of-court admission by the appellant Petrulla.
 
 E. Consecutive Sentences
 
 106
 Appellants Petrulla, Purcell, Tannhauser, Loye, and Pool argue that Congress did not intend that consecutive sentences could be imposed for conspiracy to import, 21 U.S.C. § 963, and conspiracy to possess with intent to distribute, 21 U.S.C. § 846. Furthermore, appellants contend, imposing consecutive sentences for these two conspiracies as the trial court did here violates the Double Jeopardy Clause of the Fifth Amendment. Both prongs of appellant's argument have been decided adversely to them by an en banc court and the Supreme Court. United States v. Rodriguez, 612 F.2d 906 (5th Cir. 1980) (en banc), affirmed sub. nom. Albernaz v. United States, 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981).
 
 F. Proof of Overt Act
 
 107
 Appellants Purcell, Tannhauser, Loye, and Leask argue that an overt act must be alleged and proven in order to obtain a conviction for conspiracy to import, 21 U.S.C. § 963, and conspiracy to possess with intent to distribute, 21 U.S.C. § 846. United States v. Rodriguez, 612 F.2d 906 decides this issue adversely to the appellants. Id. at 919 n.37.
 
 
 108
 G. Admissibility of Agent Starratt's Identification of "Chip"
 
 
 109
 On August 5, 1978, at 10:40 a.m. DEA Agent Starratt received a call from a person who identified himself as "Chip," a nickname used by appellant Loye throughout the investigation. The caller told the agent that Petrulla wanted DEA Agent Story to obtain another boat. Based on this conversation Agent Starratt identified Loye as the telephone participant charged with the § 843(b) violation in Count 9. The conversation was not recorded. Starratt never met Chip and he never made any voice comparison with Loye. The only way Starratt could identify the caller was through the caller's self-identification. Under these circumstances, Loye argues that Starratt's testimony identifying him is inadmissible because it was not authenticated, Fed.R.Evid. 901. Loye also argues that the identification was hearsay. Loye's contention that the identity of the caller was not properly authenticated finds support in our case law. Federal Rule of Evidence 901(a) states:
 
 
 110
 The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.
 
 
 111
 We have previously remarked that "a telephone call out of the blue from one who identifies himself as X may not be, in itself, sufficient authentication of the call as in fact coming from X." United States v. Register, 496 F.2d 1072, 1077 (5th Cir. 1974). We agree with the government that the standard of admissibility of voice identification testimony is prima facie. Id. We also agree that circumstantial evidence may be used in meeting this standard. Id. However, there is not sufficient evidence to support the conclusion that Agent Starratt actually heard Loye's voice. As noted, Starratt had never met Loye and no voice comparisons were made. Under these circumstances, Loye's use of the nickname "Chip" does not make out a prima facie case that he was the caller. See United States v. Hyatt, 565 F.2d 229, 232 (2d Cir. 1977). The possibility that someone else was using his nickname in this clandestine operation is too great to properly admit Agent Starratt's identification. This identification was essential to Loye's § 843(b) conviction. Accordingly, we reverse Loye's conviction for Count 9.
 
 H. Sufficiency of the Evidence
 
 112
 In reviewing the sufficiency of the evidence we ask whether a reasonable minded jury must necessarily entertain a reasonable doubt as to the defendant's guilt under the evidence. United States v. Slone, 601 F.2d 800, 802 (5th Cir. 1979). As most of the appellants' challenges are to their conspiracy convictions we note at the outset the rule established in our recent case of United States v. Alvarez, 625 F.2d 1196 (5th Cir. 1980) (en banc).
 
 
 113
 The government was not required to prove that Alvarez had knowledge of all the details of the conspiracy or each of its members, provided that prosecution established his knowledge of the essential of the conspiracy. United States v. Feola, 420 U.S. 671, 692, 95 S.Ct. 1255, 1267, 43 L.Ed.2d 541 (1975); Blumenthal v. United States, 332 U.S. 539, 556-57, 68 S.Ct. 248, 256, 92 L.Ed. 154 (1947). Nor can a defendant escape criminal responsibility on the grounds that he did not join the conspiracy until well after its inception. United States v. Leach, 613 F.2d 1295, 1299 (5th Cir. 1980); United States v. Bates, 600 F.2d 505, 509 (5th Cir. 1979); or because he plays only a minor role in the total scheme. United States v. Wilson, 500 F.2d 715, 724 (5th Cir. 1974), cert. denied, 420 U.S. 977, 95 S.Ct. 1403, 43 L.Ed.2d 658 (1975).
 
 
 114
 Id. at 1198.
 
 
 115
 In applying this standard we must consider the evidence in the light most favorable to the government, Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), affording every reasonable inference supportive of the jury verdict. United States v. Henderson, 588 F.2d 157, 161 (5th Cir. 1979).
 
 1. Loye
 
 116
 Loye challenges the sufficiency of the evidence to convict him of conspiracy to import, (Count I), and conspiracy to possess with intent to distribute (Count II). The evidence shows that Loye delivered $6,000 in cash from Petrulla to Weed for Weed's expenses in renting the off-load boats. While making that delivery on August 1, 1978, at Jacksonville Airport, Loye also made comments to Weed which indicated that he was well aware of the size of the operation. These facts are sufficient for the jury to infer that Loye was Petrulla's assistant and that he conspired to import and distribute marijuana.
 
 2. Leask
 
 117
 Appellant Leask challenges the sufficiency of the evidence to convict him of conspiracy to import (Count I). The record shows that on August 3, 1978, Leask arrived at Jacksonville Airport in the company of Tannhauser, one of the principal conspirators, using a fictitious name. Several of the appellants then met at an adjoining hotel where the plans of the conspiracy were thoroughly discussed. Subsequently, Leask was present during the conversations after all three off-load boats malfunctioned. This evidence is sufficient to convict him of conspiracy to import.
 
 3. Tannhauser
 
 118
 Appellant Tannhauser challenges the sufficiency of the evidence to convict him of conspiracy to possess with intent to distribute. A review of the facts as presented in Section II, supra, reveals that Tannhauser's argument is frivolous. He played a central role in planning and executing this criminal scheme. We note that the term "distribute," 21 U.S.C. § 802(11), is not restricted to distribution of a drug to the ultimate consumer. It also may, in appropriate circumstances, refer to the distribution of a controlled substance from one conspirator to another. See United States v. Bass, 535 F.2d 110 (D.C.Cir.1976). Here, for example, the transfer of marijuana from the mother ship to the off-load boats constitutes distribution as contemplated by 21 U.S.C. § 802(11).
 
 I. Legal Impossibility and Section 843(b)
 
 119
 Appellants Petrulla and Loye contend that it is legally impossible for a defendant to commit, cause or facilitate the commission of a Title 21 felony by talking on the telephone with a DEA agent. Counts 4-7 and 10 charged that Petrulla used a telephone to commit a Title 21 felony.[5] United States v. Rodriguez, 546 F.2d 302 (5th Cir. 1976), decides this issue adversely to appellant Petrulla. Rodriguez holds that "willing participation in the phone calls by the appellants" is sufficient to sustain a § 843(b) conviction. Here Petrulla not only participated willingly in the calls but also gave extensive instructions to the agents in order to facilitate the conspiracy during these calls.[6]
 
 J. Restriction of Closing Argument
 
 120
 Appellant Loye argues that it was error to restrict his counsel from making certain arguments in his closing statements. Counsel's closing argument must derive from the record. United States v. Morris, 568 F.2d 396, 401 (5th Cir. 1978). Furthermore, the trial court has broad discretion to control closing argument. United States v. Grabiec, 563 F.2d 313, 319 (7th Cir. 1977). Our review of the record reveals that Loye's counsel attempted to make arguments unsupported by the record. The trial judge was correct in prohibiting this course of argument.K. Severance
 
 
 121
 Appellants Leask, Loye, Tarpley, and Pool argue that they were prejudiced in a variety of ways by the court's failure to sever their trials. The trial judge has broad discretion to grant or deny motions for severance. Furthermore, the defendant bears the burden of showing actual prejudice resulting from the denial of a severance motion. United States v. Henderson, 489 F.2d 802 (5th Cir. 1973). Our review of the records reveals no abuse by the trial judge in joining the defendants, see Fed.R.Crim.P. 8, or in failing to grant their severance motions. See Fed.R.Crim.P. 14.
 
 
 122
 L. Admissibility of Certain Hearsay Statements
 
 
 123
 Appellants Tarpley and Loye contend that three hearsay statements were incorrectly admitted by the trial judge. The first statement was made by Petrulla to DEA agent Story. Petrulla told Story that Bradley (appellant Tarpley's code name throughout the conspiracy) was going to make a "kamakazie run" into the Bahamas to refuel the mother ship. The admission was properly admitted to rebut a question asked by Tarpley's counsel. Tarpley's counsel attempted to establish that the agents knew little about "this Bradley person," i.e. Tarpley. Specifically, he asked agent Story if he heard anyone mention "Bradley's" name after August 5. Story had heard the name three days later in the discussion regarding the "kamakazie run." The court properly gave an instruction limiting the jury's consideration of this evidence to rebuttal only. Under these circumstances and in light of the other substantial evidence against Tarpley the principles of Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), were not violated by admitting this statement.
 
 
 124
 Second, appellants argue that the statements made by and regarding "Chuck" and "Dale" which were introduced through the testimony of Agent Story were inadmissible against them because they were not shown to have been related to the particular conspiracy of which appellants Tarpley and Loye were a part. See Brief of Appellant Tarpley at 13. As the government points out, a single conspiracy is not divisible simply because of personnel changes. See United States v. Bates, 600 F.2d 505, 509 (5th Cir. 1979). As our extensive recitation of the facts shows, Chuck and Dale played a central role in the genesis of this conspiracy. Their statements were properly admitted declarations of the conspirators.
 
 
 125
 Third, the appellants challenge the admission of statements made to undercover agents while on board the off-load vessels on August 4-5. Relying on United States v. James, 510 F.2d 546 (5th Cir. 1975), appellants argue that a narrative of past facts is inadmissible as a coconspirator declaration. However, we have held that when a conspirator provides information to his coconspirators necessary to keep them abreast of the conspiracy's current status, such statements are properly admitted as coconspirator declarations. United States v. Goodman, 605 F.2d 870, 878 (5th Cir. 1979). Here, it was reported that Purcell communicated the whereabouts and estimated time of arrival to the crew. Hence, his statements were properly admitted.
 
 IV. Conclusion
 
 126
 Appellants' other arguments are without merit. Accordingly, appellants' convictions and sentences are affirmed with the exception of appellant Loye's conviction on Count 9.
 
 
 127
 AFFIRMED in part; REVERSED in part.
 
 
 
 *
 Former Fifth Circuit case, Section 9(1) of Public Law 96-452 October 14, 1980
 
 
 [1]
 Appellants Leask and Loye also raise this issue but there is nothing in the record to support their having done so
 
 
 [2]
 The Supreme Court has explicitly stated that it is the duty of the court to determine the legitimacy of a witness' reliance upon the Fifth Amendment. Rogers v. United States, 340 U.S. 367, 374-375, 71 S.Ct. 438, 442-43, 95 L.Ed. 344. Furthermore, if the appellants had asserted a Fifth Amendment challenge in a timely fashion and the court had sustained the challenge, the government still would have had the option to grant the appellants immunity
 
 
 [3]
 The trial judge appears to have devised a fair method of resolving the ambiguity in silence on the part of defendants. Whether such silence is the exercise of defendant's constitutional right to refuse to incriminate himself or is evidence of defendant's obstinate determination to obstruct justice can be determined only when, and if, defendant's conviction has been finally affirmed. At that point, Reina effectively eliminates Fifth Amendment exercise as an explanation for continued silence, leaving obstruction as the clarification of the prior ambiguity
 
 
 [4]
 At trial, Petrulla did request that the instruction be amplified by an instruction regarding the witnesses credibility. However, when a defendant objects on one ground at trial and then urges on appeal that the objection should have been sustained on another ground the plain error standard is properly applied. See United States v. Haynes, 573 F.2d 236, 241 n.8 (5th Cir. 1978)
 
 
 [5]
 We need not consider Count 9 that charged Loye with a § 843(b) offense because we have reversed his Count 9 conviction on other grounds. See Section G, supra
 
 
 [6]
 The variance argument which appellant Petrulla makes is not fatal to his conviction. See United States v. Arteogo-Limoens, 529 F.2d 1183, 1193 (5th Cir. 1976)